*In re* BOURSAW

Docket No. 214828. Submitted July 8, 1999, at Lansing. Decided December 17, 1999, at 9:15 A.M. Leave to appeal sought.

The Family Independence Agency petitioned the Midland Circuit Court, Family Division, for an order terminating Jennifer L. Boursaw's parental rights to her minor child, who had been placed in a foster home after an order of temporary custody was entered. The court, Donna T. Morris, J., concluded that termination of the respondent's parental rights was justified under MCL 712A.19b(3)(g) and (j); MSA 27.3178(598.19b)(3)(g) and (j), and entered an order to that effect. The respondent appealed by delayed leave granted, alleging that the court erred in concluding that the statutory grounds for termination had been established by clear and convincing evidence.

The Court of Appeals *held*:

1. There is no evidence that the respondent ever struck or purposefully harmed the child in any way.

2. The court's conclusions regarding subsections 19b(3)(g) and (j) were apparently based on testimony that does not provide clear and convincing support for the termination of the respondent's parental rights.

3. The steps taken by the respondent since a review hearing three months before the termination hearing indicate that termination of her parental rights was premature. The respondent had made significant strides toward remedying the problems that had brought this matter to the petitioner's attention.

4. The petitioner did not establish with the required degree of certainty that the termination of this familial bond was warranted. The trial court's conclusion that there is a reasonable likelihood that the child would be harmed if reunited with the respondent was essentially conjecture. Sufficient evidence was not offered to show that the respondent would not be able to give the child proper care and custody within a reasonable time.

5. The parties had the mistaken belief that once the statutory grounds for termination are established by clear and convincing evidence, the burden of proof shifts to the respondent to establish that termination is not in the child's best interests. The burden of

proof remains with the party seeking termination, but once a statutory ground for termination has been established, the parent is required to put forth some evidence that termination is clearly not in the child's best interests. If the parent does not put forth any such evidence, termination is automatic. If the parent does put forth such evidence, the mandatory presumption in favor of termination is lifted, and the party seeking termination must then again meet its burden of proof with regard to the matter.

Reversed and remanded.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — APPEAL.

The Court of Appeals reviews for clear error a circuit court's termination of parental rights.

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — BURDEN OF PROOF — BURDEN OF GOING FORWARD WITH EVIDENCE.

The burden of proof in proceedings in which termination of parental rights is sought is on the party seeking by court order to terminate the rights of the parent over the child; once the party seeking termination establishes with clear and convincing evidence that a statutory ground for termination exists, a presumption for termination is raised that can only be rebutted by a showing that termination is clearly not in the child's best interests; while the burden of proof remains with the party seeking termination, once a statutory ground is established, the parent must put forth some evidence that termination is clearly not in the child's best interests; if the parent does not put forth such evidence, termination is automatic; if the parent does put forth such evidence, the mandatory presumption in favor of termination is lifted and the party seeking termination must again meet its burden of proof with regard to the matter (MCR 5.974[A][3]; MCL 712A.19b[5]; MSA 27.3178[598.19b][5]).

*Charlotte L. Allen, P.C.* (by *Charlotte L. Allen*), for the respondent.

Before: HOLBROOK, JR., P.J., and ZAHRA and J. W. FITZGERALD*, JJ.

PER CURIAM. Respondent mother's application for delayed appeal from an order of the Midland Circuit Court, Family Division, terminating her parental

---

* Former Supreme Court justice, sitting on the Court of Appeals by assignment.

rights to her minor child, D.B., born April 8, 1996, was granted. We reverse and remand.

I

It appears from the record that respondent and her daughter first came to the attention of petitioner Family Independence Agency (FIA) early in 1997. On October 9, 1997, a preliminary hearing was held with regard to petitioner's petition to take temporary custody of the child. Respondent served as her own counsel at that hearing. Petitioner's fifteen allegations fell primarily into five general categories: (1) failure to properly take care of the child's respiratory illnesses, including the failure to follow through with prescribed medication and the failure to stop smoking around the child; (2) failure to maintain a clean residence; (3) failure to properly supervise the child; (4) failure to find steady employment; and (5) failure to make significant progress while working with Families First employees. The petition also alleged that respondent failed to keep a scheduled psychiatric evaluation and that respondent claimed to have experienced " 'black outs and gray outs' that last anywhere from a few seconds to a full day." In its posthearing order, the circuit court found that probable cause existed to support the following allegations:

> a. Custody of the child with the parent presents substantial risk of harm to the life, physical health, or mental well being of the child.
>
> b. No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from the risk described above.
>
> c. Conditions of custody away from the parent are adequate to safeguard the health and welfare of the child.

The child was removed from respondent's care and placed in a foster home.

Next, a two-day bench trial was held on January 20 and 21, 1998. Testimony was taken from Tammy Phillips, M.D. (primary physician for respondent and the child), a family independence specialist employed by the Midland Family Independence Agency, two employees of Lutheran Child and Family Services, and a pediatric nurse. At the conclusion of the trial, the court first rejected as unsupported two of the fifteen allegations contained in the petition.[1] It then made the following remarks:

> [T]his young mother definitely has problems. I feel somehow—also that she has not gotten the type of help that should have been given to her. . . . She needs help in supervising the child, and she most certainly needs help in scheduling her life and the child's schedule. So, I find by a preponderance of the evidence that certainly . . . more than, one or more of these allegations . . . have been proved and, therefore, the Court is going to find that there has been an inability[,] or we call it neglect under the statute[,] to properly parent this child, and I think the greatest issue to the Court[,] and the Court is most sympathetic having been a smoker[,] that it just seems to me that the file is replete with the fact that this child cannot be around cigarette smoke. And if that takes us to recommend[,] and I probably

---

[1] The court rejected allegations three and thirteen of the petition:

3. When [the child] was hospitalized in May 1997, Jennifer would become upset with the nurses and called them "bitches." Jennifer also refused to change her daughter's diapers and threw food on the floor. On occasion, Jennifer would go outside and smoke in front of the window where [the child] could see her, making [the child] upset.

13. Because Jennifer has not cooperated with her FIS Worker, the food supply at the Boursaw residence will be minimal. Families First took Jennifer to WIC and picked up at least eight gallons of milk, and within a week, she was out of milk.

will right now[,] to the Department that she go to the Cancer Services program on quitting smoking and understanding what smoking can do to an infant. That, that is today, neglect. When I was a young mother nobody ever said anything about it, but it is different today and we know more and we have a child with . . . weak lungs and that must not happen with this child. So, I am going to take jurisdiction of [the child] and we will set this over for dispositional.

The dispositional hearing was held on February 6, 1998. Respondent and her mother testified on respondent's behalf, and Sheree Murray, an FIA employee supervising respondent's case, testified on petitioner's behalf. At the close of this hearing, the court adopted the case plan recommended by petitioner. Under the plan, the child remained a temporary ward of the court under petitioner's supervision. Further, respondent was required to obtain psychological counseling and fully participate in parenting classes. She was also required to either fully participate in the Work First Program or apply for Supplemental Security Income (SSI), and complete twenty hours of community service a month or pay $20 a month while the child was in foster care. The court also directed the following comments to respondent:

Okay, so I want you to have some plan with Ms. Murray, your mother, whomever[,] that she is able to get ahold [sic] of you if she needs you, and you've got to start working, Jennifer. Now, I don't mean job working, I mean you have got to get that SSI in,[2] and you have to get to mental health or Catholic Family Services whichever Ms. Murray finds is appropriate and you've got to get into counseling immediately. I want that referral made almost as an emergency one, because time is ticking and the law does not allow me

---

[2] The record contains a receipt for respondent's SSI claim dated February 13, 1998.

beyond a year. And it used to be a year after the adjudication, after the trial, it is now changing to a year from removal. So, the time is going faster, and you have to show us that you are willing to do some of the things that are necessary if [the child] were to be returned to you.

A review hearing was then held on May 5, 1998. The only witness at the hearing was Ms. Murray. Ms. Murray testified that respondent had begun meeting with psychologist Randy Christensen after twice failing to meet with another counselor. Ms. Murray also recounted a conversation with Lisa Gullo, the instructor of respondent's parenting class, in which Ms. Gullo noted that while respondent did regularly attend and participate in the classes, respondent also seemed to have "scattered thoughts." Although Ms. Murray indicated that respondent had been late to her weekly supervised visitation with the child only a "couple of times," she nonetheless opined that "it seems to be a . . . frequency with Jennifer is to be late." As for the visitations themselves, Ms. Murray testified that while respondent "doesn't do anything blatantly harmful to the child or anything like that, the main thing that gets reported . . . is that [the child] just prefers not to do a lot of interacting with her mom. She doesn't want to be hugged, and held and kissed." Ms. Murray also expressed concern over respondent's employment history and living arrangements.

Ms. Murray was also extensively questioned by respondent's attorney about exactly what respondent could do to avoid termination of her parental rights:

Q. What types of things can Jennifer do to convince you that [a] termination hearing is not necessary?

*A.* Follow through on her, on her counseling. She needs to be consistent and regular and not miss appointments. She needs to develop a rapport with the counselor and internalize what they work on together. If he indicates that there's a concern with her as far as schizophrenia, then a follow-up needs to be made to a psychiatrist. If it's recommended that she be on medication, she get on the medication, she follow through on that, and take her medication and see if there's an improvement there. She needs to have stability in her life. Maintain employment. She needs to have a place where she can live and I can go see it and observe it and see how she's doing there and have a place where I can get a hold of her. She needs to be on time for the visits. She needs to follow through and not be late with those. . . . Be—following through and consistent with everything that she's asked to do, such as . . . the SSI . . . .

\* \* \*

*Q.* Okay, the fact that she got Social Security and SSI information done, you're happy that, that's done?

*A.* I'm glad that's done. I feel that's important. . . .

*Q.* If she gets a positive report from Randy Christensen, counselor, and consistent in her visitations, is on time, positive report from Lisa Gullo from the parenting skills class, is made the determination if she does have schizophrenia, . . . she gets the proper medication, maintains all appointments, maintains employment, gets a safe environment that you can come and take a look at, would you still be asking for termination?

*A.* Possibly not, I'm—with, with—

*Q.* Have you already made your mind up?

*A.*—no, with the indication that Jennifer would follow through on her medication, that would be my main concern is a parent taking the medication with mental illness and the assurance and what kind of assurance could I be given that Jennifer would take that, her—as needed [the child's] whole life.

*Q.* So, with certainly [a] long check list of things to do, but if she does that you have not absolutely made your mind up

then, you would be willing to make a recommendation opposite if you find significant changes in this file?

A. Yes.

At the conclusion of the review hearing, the court made the following statement:

> If Jennifer can present to the Court [in August 1998] that she has been faithful and consistent in her counseling with Mr. Christensen[,] with the work that Dr. Phillips is doing with her, if she has a job, continues a job, has a place to live, and that place is appropriate and, ah, gets to her visitations on time and is appropriate, spends her time with [the child], not calling other people or worrying about things other than just that time, then the Court surely will, and the basis of those things say let's wait and watch, depending on what all those reports are. . . .

> \*     \*     \*

> . . . [B]e it right or wrong, it appears everywhere, it appears in the psychiatric that she must be into counseling, . . . so, that has got to be stressed as, as the key to all this because from that counseling will come a referral, if needed, to a doctor for medication, will let us know what her priorities are, and, what she's interested in.

II

The termination hearing was held on August 12 and 13, 1998. In an opinion and order dated August 24, 1998, the circuit court concluded that termination of respondent's parental rights was justified under MCL 712A.19b(3)(g) and (j); MSA 27.3178(598.19b)(3)(g) and (j).[3] Respondent argues on appeal that the court

---

[3] The two provisions read at that time:

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expecta-

clearly erred in concluding that these statutory grounds for termination had been established by clear and convincing evidence. We agree. This court reviews the circuit court's termination in its entirety for clear error. *In re Huisman*, 230 Mich App 372, 384; 584 NW2d 349 (1998).

Of the two grounds cited by the circuit court, we are most puzzled by the court's reliance on subsection 19b(3)(j). There is no evidence in the record that respondent ever struck or purposefully harmed the child in any way. Rather, the court based its conclusion on what it characterized as respondent's "poor judgment." Unfortunately, the court failed to specify what "judgments" it was concerned about. After examining the court's findings of fact, we conclude that the court's concern stems from respondent's past troubles coupled with Mr. Christensen's testimony regarding respondent's prognosis for recovery from her personality disorder.[4] It appears the court concluded that respondent is likely to repeat past poten-

---

tion that the parent will be able to provide proper care and custody within a reasonable time considering the age of the child.

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

[4] We focus particularly on the court's fifth finding of fact:

Randy Christensen, Jennifer's mental health therapist testified. Mr. Christensen had his first session with Jennifer on April 28, 1998. Jennifer has a personality disorder. He defines this disorder as a chronic pattern of instability in thought, behavior and judgment. One with this disorder has up and down moods and impulsiveness. Even after eight sessions, Jennifer is not at the point where she is trusting enough of Mr. Christensen that he can work on parenting issues with Jennifer. In the best case scenario, with Jennifer motivated and trusting her therapist, it would take four to six months before Jennifer could handle more time with a child. In this disorder, counseling should continue for two years. By then, if all goes well, Jennifer should be able to parent independently.

tially harmful behaviors (e.g., not following through on medications and immunizations, smoking in front of the child) given her present mental state.

The court's conclusions regarding subsection 19b(3)(g) also appear to be predicated on Mr. Christensen's testimony.[5] Accordingly, we pay close attention to precisely what Mr. Christensen had to say about respondent's condition and prognosis.

### A

Like much of the psychiatric testimony we have reviewed in the past, Mr. Christensen's testimony is distinguished by the witness' efforts to avoid making absolute pronouncements on respondent's potential for recovery. The following excerpts typify Mr. Christensen's testimony regarding respondent's prognosis:

> *Q.* What do you think it would take from where you're at now to even get to the point where you could start trusting the parenting issues with Jennifer?
>
> *A.* What it would take and what I'm hoping for is that Jennifer can quickly increase her level of trust with me to the point where she will come into the sessions saying what do I need to fix, what do I need to change, give me some advice on how I can do these things better and then go out with focus and consistency and implement some of the things that we talk about. She has the capacity to do that. How soon that can happen I'm not sure, but we need to get to that point and just because of the normal time pressures

The unnamed disorder was identified by Mr. Christensen as being a borderline personality disorder.

[5] The Court finds by clear and convincing evidence that Jennifer Boursaw, without regard to intent, failed to provide proper care or custody for [the child] by not providing proper medical care or a safe environment and there is no reasonable expectation that . . . Jennifer will be able to provide proper care and custody within a reasonable time considering the age of [the child].

involved with child removal situations and the system and so on we need to get to that very, very quickly and I hope she can.

*Q.* If there is a best case scenario for her on her progress, what do you see that being as far as . . . ?

*A.* If she could come into our next session the way I just described to you, and maintain consistent focused work between our appointments so that we stay on topic from one session to the next with continuity we're looking at a period of four to six months where, at that point, best case scenario she'd be able to interact with the child in a way that's consistently constructive for the child although continued counseling and support and supervision would still be encouraged then I'm not sure she'd be ready for independent child management—I don't want to say, I don't mean unsupervised, but without resources supporting her.

*Q.* Okay. What do you think the likelihood is of that, you actually getting to that point in four to six months?

*A.* I don't know whether we will or not, um, this is a lot of difficult habits that we're looking at changing and so, I'm, I'm cautiously optimistic, guarded, that's the general flavor is the best I can give you. . . .

\* \* \*

*Q.* Would she be to the point where she could take care of the child twenty-four hours a day on her own?

*A.* That's the part I'm saying I don't think she would be ready for that yet.

*Q.* Okay. And what would she have to do to be able to do that?

*A.* Maintain the kind of life style and consistency over time that under the best case scenario, she's already doing. It will take time to kind of replace good habits with bad habits [sic] and four to six months isn't enough time to replace these habits in a confident way that will be permanent. So, she would need more time to keep doing the good things that we're assuming that she's doing.

\* \* \*

*Q.* Okay. Say if time wasn't a factor at all, what would you see the progress being or what would you recommend about approaching this?

*A.* Ah, a couple years in counseling for someone with a borderline personality is not at all unusual, I've got several people on my caseload now that I've been seeing for two to three years . . . .

*Q.* . . . [A]t the end of that two to three years, . . . what would [be] the likelihood if there's a percentage that Jennifer would be able . . . to parent the child day in and day out on her own?

*A.* That's a pretty difficult question. Certainly the time, if she were to stick with counseling over that period of time, ah, shows motivation and some desire to make some changes. It's still no guarantee, the changes would be better to say, to give you a percentage, I don't know, ah, fifty-fifty, seventy-five maybe that she could parent independently. It's really a difficult question to answer. Certainly I would like an opportunity to try that . . . .

We do not believe that Mr. Christensen's testimony provides clear and convincing support for the termination of respondent's parental rights. Mr. Christensen did indicate that he believed respondent would need continuing counseling, but he also indicated that with the proper motivation respondent could begin serious work on dealing with her behavior as a parent within four to six months. We believe, given the ample evidence in the record of respondent's love for her daughter, the possibility that respondent would be able to regain custody of the child would give respondent the kind of motivation Mr. Christensen was looking for. Indeed, Mr. Christensen did indicate that he was "cautiously optimistic" that such progress could be made. And while Mr. Christensen believed it might take a couple of years to see if respondent fully internalized the types of positive behavior changes

that the court and petitioner were looking for, it is clear that Mr. Christensen believed the possibility existed that respondent would ultimately achieve such a level of functioning.

We also note that Mr. Christensen never indicated that it would take two or three years before respondent could even attempt to parent the child on a daily basis. Rather, the import of Mr. Christensen's testimony is that he believes it would take two or three years before he could be confident that respondent's positive behavior changes would endure. Further, there is nothing in Mr. Christensen's testimony that suggests that respondent's contact with the child needed to remain limited to one supervised hour a week for the duration of the two or three years. It is more likely that as respondent progressed, her time with and responsibilities for the child would be increased. This would be the only way that Mr. Christensen, petitioner, and the court would be able to tell whether respondent was fully integrating into her life her changed behavior patterns.

B

We also believe the steps taken by respondent since the May 5 review hearing evidence that termination was premature. The record shows that respondent had made significant strides in meeting each criterion set down by the court at that hearing. For example, as the court instructed, respondent had been working with a counselor (Mr. Christensen). In a letter addressed to Ms. Murray and dated July 31, 1998, Mr. Christensen observed that respondent "is putting forth constructive effort in therapy." She also

had obtained employment,[6] transportation, and reen-
tered and cleaned her apartment. Indeed, in his final
report to the court, counsel for the child made the
following comment about the state of respondent's
apartment at the time of the termination hearing:
"Frankly, I would have no qualms about [the child]
residing in the apartment as it currently stands."[7]

The record also shows that since the review hear-
ing, respondent consistently attended her supervised
visitations with the child. The twelve visitation
reports that cover the time since the May 5 hearing
indicate that respondent was always prompt in arriv-
ing for the visitations and cooperated well with the
supervisor. Various reports also indicate that respon-
dent properly and effectively disciplined the child
when needed. On May 19, 1998, the supervisor
observed that the child was asking and looking for
her mom at the time of the visitation. On June 2,
1998, the supervisor wrote that "[the child] now anx-
iously waits for mom's appearance." The supervisor
concludes her narrative summary for that day with
the following comment: "It is a pleasure to witness
the interaction between them."[8] On June 16, 1998, the
supervisor wrote that "mom is now enjoying [the
child] for the age she is, and accepting her limita-
tions." On July 7, 1998, she wrote, "I've seen much

---

[6] The record establishes that respondent was holding down two part-
time jobs at the time of the August termination hearing.

[7] Counsel's report also indicates a level of frustration that it took so
long for the apartment to reach this condition.

[8] The growth in the relationship between mother and daughter appears
to address Ms. Murray's concern, voiced at the May 5 review hearing,
"that [the child] just prefers not to do a lot of interacting with her mom.
She doesn't want to be hugged, and held and kissed."

improvement in the intercommunication between Mother and daughter."[9]

The record also contains the following letter from Dr. Phillips, dated August 5, 1998, and addressed to respondent's attorney:[10]

> I received an inquiry from you regarding Jennifer Bour-saw. She was seen in this office in April of 1998, for her general physical examination. . . . She was seen here recently on July 28, 1998, for pain in her pelvis and upper rib cage. Most striking about that visit was the fact that Jennifer looked very nice. She was neat, well kept and groomed. Her thoughts seemed to be more organized. She seems to have made great progress toward organization of taking care of herself and her thought patterns.

C

In support of its decision to terminate the respondent's parental rights, the circuit court cited and quoted *In re Dahms*, 187 Mich App 644; 468 NW2d 315 (1991). We believe that the court's reliance on that case is misplaced, given significant differences that exist between *In re Dahms* and the case presently before us. In *In re Dahms*, this Court made the following observations:

> [A]lthough we are aware that respondent has made progress in her therapy, we do not believe that the two to three years of therapy necessary for her to reach an acceptable level of parenting skill is reasonable considering the ages of

---

[9] As previously observed, before the May 5 hearing, respondent also attended and participated in the required parenting classes. The parenting class instructor testified during the termination hearing that respondent "appeared to understand the material that was presented and she actively participated in class."

[10] We note that on May 5, the circuit court indicated that it would be looking to see if respondent continued to work with Dr. Phillips.

the children *and their unique needs resulting from the abuse and neglect.* . . . It . . . must be recognized that because of the history of neglect, these young children have *pervasive behavior disorders that require extensive attention.* [*Id.* at 647 (emphasis added).]

The "pervasive behavior disorders" referred to were described by the Court in this manner: "[T]wo of the children would frequently act like wild dogs, barking incessantly and eating off their plates without using utensils. The youngest child demonstrated signs of impaired socialization, . . . and the oldest demonstrated behavior indicative of sexual abuse." *Id.* at 646. There is nothing in the record of the case before us that indicates that the child is suffering from similar problems. There is also nothing that would indicate that the child would exhibit increasingly special needs that "would be too much for respondent to handle effectively . . . ." *Id.* at 647-648.

D

After reviewing the record, we are left with the definite and firm conviction that a mistake has been made. *In re Conley*, 216 Mich App 41, 42; 549 NW2d 353 (1996). While respondent may not yet be a model parent, we believe the record shows that, at the time of the termination hearing, she had made significant strides toward remedying the problems that had brought this matter to petitioner's attention. Furthermore, we cannot stress too strongly that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). The goal of

reunification of the family must not be lost in the laudable attempt to make sure that children are not languishing in foster care while termination proceedings drag on and on. See *id.* at 765 (observing that "the parents and the child share an interest in avoiding erroneous termination"); *Lassiter v Dep't of Social Services*, 452 US 18, 27; 101 S Ct 2153; 68 L Ed 2d 640 (1981) ("A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one.").

We believe that petitioner has not established with the required degree of certainty that the termination of this familial bond was warranted. The trial court's conclusion that there is a "reasonable likelihood" that the child would be harmed if reunited with respondent strikes us as being "essentially conjecture . . . ." *In re Sours Minors*, 459 Mich 624, 636; 593 NW2d 520 (1999). Likewise, we do not believe that sufficient evidence was offered that respondent would not be able to give the child the proper care and custody within a reasonable time. Mr. Christensen's qualified speculations about the time it might take to be sure that respondent has mastered her behavior problems does not obscure the fact that he also believed that such progress is possible. Furthermore, the significant achievement respondent made in achieving the goals set for her by the circuit court show that at the time of the termination hearing, respondent's priorities did indeed lie with her daughter. Accordingly, we believe that termination of her parental rights was premature.

We note that given the significant amount of time that has passed since respondent's parental rights were terminated, determined efforts will need to be

expended in furtherance of the goal of reunification of this family. We also observe that the evaluation of respondent's progress should not be adversely influenced by the consequences of this mistaken termination.

III

Finally, we choose to take this opportunity to address a misconception that arose during the termination proceedings. It appears from the transcript of the August 12, 1998, hearing, that the parties were operating under the mistaken belief that once the statutory grounds for termination are established by clear and convincing evidence, the burden of proof shifts to respondent to establish that termination is not in the child's best interest.[11]

This common misunderstanding stems from the failure to distinguish between the burden "of going forward" with evidence and the burden "of proof." MCR 5.974(A)(3) clearly states that in proceedings in which termination of parental rights is sought, "[t]he burden

---

[11] The following exchange between the court and respondent's attorney is illustrative:

*The Court*: I have a little problem on that burden of proof, too, Mr. Carpenter. There have been some cases that have come out that have said that it's the Prosecutor's, rather recent, burden to prove the petition, I think, convincing evidence, it then shifts to the respondent's to overcome that, so it's kind of a . . .

*Mr. Carpenter*: Your Honor, I have read the recent case of, 1997, case and presented it to the Court, it's my understanding in reading that case was that it still needs to be proven to this Court and work on those petitions, clear and convincing evidence that the allegation has been made, and then switches, and I would agree—

*The Court*: Uh huh.

*Mr. Carpenter*:—then it's best interest does become in a strange way our burden.

*The Court*: Sure.

of proof is on the party seeking by court order to terminate the rights of the respondent over the child." Under MCL 712A.19b(5);   MSA 27.3178(598.19b)(5), once the party seeking termination has established with clear and convincing evidence that a statutory ground for termination exists, a presumption for termination is raised "that can only be rebutted by a showing that termination is clearly not in the child's best interest." *In re Hall-Smith*, 222 Mich App 470, 472; 564 NW2d 156 (1997). The burden of going forward with some evidence concerning the best interests issue rests with the parents. *Id.* at 473. This does not mean, however, that the parents bear the burden of proof regarding the bests interests question. See *In re Miller*, 433 Mich 331, 345-346; 445 NW2d 161 (1989).[12]

In other words, while the burden of proof remains with the party seeking termination, once a statutory ground for termination has been established, the parent is required to put forth some evidence regarding

---

[12] The Court in *In re Miller* concluded that the trial court had not improperly shifted the burden of proof when it instructed the jury that under MCL 712A.19a(f);   MSA 27.3178(598.19a)(f),   as amended by 1972 PA 59, " 'The parents then have the burden of going forward with the evidence, *though never have the burden of proof,* to show that there is a reasonable probability that they will be able to reëstablish a proper home.' " *In re Miller, supra* at 345-346 (emphasis added). In *In re Hall-Smith, supra* at 473, this Court concluded that the same requirements should exist with respect to termination   sought   under   MCL   712A.19b(5); MSA 27.3178(598.19b)(5),   as added by 1994 PA 264:

Similarly, we believe that once a statutory ground for termination has been met by clear and convincing evidence, the language of [subsection 19b(5)] requires a parent to put forth at least some evidence that termination is clearly not in the child's best interest. *Absent any evidence addressing this issue by the parent, termination of parental rights is mandatory.*" [Emphasis added.]

the issue whether termination is "clearly not in the child's best interests." MCL 712A.19b(5); MSA 27.3178(598.19b)(5). If the parent does not put forth any evidence addressing the issue, termination is automatic. *In re Hall-Smith, supra* at 473. If, however, the parent does put forth such evidence, the mandatory presumption in favor of termination is lifted, and the party seeking termination must then again meet its burden of proof with regard to the matter.

Reversed and remand. We do not retain jurisdiction.

J. W. FITZGERALD, J. I concur in the result only.