*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

IN RE WILLIAMS/COPELAND, MINORS.

UNPUBLISHED
October 1, 2019

No. 346933
Genesee Circuit Court
Family Division
LC No. 15-132705-NA

Before: O'BRIEN, P.J., and BECKERING and LETICA, JJ.

PER CURIAM.

Respondent mother appeals as of right the trial court order terminating her parental rights to five of her six children.[1] The trial court found grounds to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(a)(*i*) (parent unidentified, 28-day desertion), MCL 712A.19b(3)(a)(*ii*) (parent deserted child for 91 days or more), MCL 712A.19b(3)(c)(*i*) (conditions of adjudication remain after 182 days, no likelihood of remedy within reasonable time), MCL 712A.19b (3)(g) (failure to provide proper care or custody), and MCL 712A.19b (3)(j) (reasonable likelihood of harm if child is returned to the parent's home). On appeal, respondent challenges the trial court's finding that statutory grounds for termination exist and that termination was in the best interests of the children. We affirm the trial court's termination order.

---

[1] At the beginning of these proceedings, the trial court placed one child with her biological father, who had already expressed the desire to establish legal paternity. Throughout the proceedings, the court heard reports of how happy, healthy, and cared for the child was with her biological father. After the biological father completed the requirements to establish legal paternity, the court granted him full physical and legal custody of the child, and granted respondent supervised parenting time at the father's discretion.

## I. RELEVANT FACTS AND PROCEEDINGS

Petitioner, the Genesee County Department of Health and Human Services, filed an initial petition in December 2015, asking the trial court to remove respondent's children from her care due to medical neglect and improper supervision. The allegations arose from incidents that began two days prior to the filing of the petition. Hurley Medical Center had admitted respondent's 21-month old, with a seven-centimeter untreated abscess on her buttocks that had become infected, and her three-month old, whom doctors surmised respondent was improperly feeding and who weighed only nine pounds. The day after Hurley admitted the children, it sedated and admitted respondent involuntarily due to suicidal ideations she was having while in the hospital room with her children. Following a preliminary hearing, the court authorized the petition, placed the children under the supervision of DHHS, and granted respondent supervised parenting time.

In February 2016, respondent pleaded no contest to allegations of medical neglect and improper supervision and the court took jurisdiction over the children. The court ordered respondent to "complete, comply with, and demonstrate benefit" from: a psychological evaluation and recommendations, current mental health services, therapy and life skills services, domestic violence services, and parenting coaching services. The court also ordered respondent to obtain and maintain adequate housing and a legal source of income and to sign releases for information regarding the referred services and mental health treatment. Finally, the court granted respondent parenting time three times weekly with her youngest child (to facilitate bonding with the infant) and twice weekly with the other children.

The record establishes that respondent suffers from various mental illnesses and limited cognitive abilities. Samaritas foster-care caseworker Holly Waggoner reported at the hearing to terminate respondent's parental rights that respondent's psychological evaluation stated that respondent had a full scale IQ of 60 and ranked in the 0.1 percentile range among her peers when it came to using logic, judgment and reason in her social decision-making processes. Throughout the proceedings, respondent cycled between mental stability, followed by neglecting to report for her medication administration and to participate in the mental health services provided her, which resulted in instability and eventual hospitalization for treatment, which ushered in a period of stability and the beginning of a new cycle. After 35 months where respondent did not complete her parent-agency treatment agreement, received hospital inpatient treatment several times for her mental health issues, missed numerous appointments and parenting-time visits, showed limited parenting abilities, and was out of touch with the foster care agency for long periods of time, petitioner filed a supplemental petition seeking termination of her parental rights.

At the termination hearing, Waggoner testified to the pattern of respondent's inability to attend consistently to her mental health issues and to acquire and exercise basic parenting skills. She also recounted how difficult it sometimes was to contact respondent and stated that respondent had not completed a majority of the things she agreed to do in the parent-agency agreement. As to the children, Waggoner testified that, although one of the children was struggling with his placement and was working with his therapist and the foster parent to determine if that was the right placement for him, the others were doing very well. She opined that even under the best of circumstances, it would take respondent at least 18 months to two

years to achieve reunification with her children and that it was in the children's best interest to have a sense of permanency, stability, and finality. Respondent contended that the two months she had spent in the hospital prior to the termination hearing had stabilized her mental health issues. Consequently, if given more time, she believed she could comply with the parent-agency treatment plan and advance toward reunification with her children. At the close of the hearing, the trial court found that clear and convincing evidence established various grounds for the termination of respondent's parental rights and that a preponderance of the evidence indicated that termination was in the children's best interests. The court issued a corresponding order, from which respondent now appeals.

## II. ANALYSIS

## A. GROUNDS FOR TERMINATION

Respondent contends that clear and convincing evidence did not establish any of the statutory grounds for termination of her parental rights. We disagree.

This Court reviews the trial court's findings that a ground for termination has been established and that termination is in the child's best interests under the clearly erroneous standard. MCR 3.977(K); *In re Rood*, 483 Mich 73, 90-91 (CORRIGAN, J.); 126 n 1 (YOUNG, J., concurring in part); 763 NW2d 587 (2009). A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake was made. *In re Mason*, 486 Mich, 142, 152; 782 NW2d 747 (2010). To be clearly erroneous, a decision must be more than maybe or probably wrong. *In re Sours Minors*, 459 Mich, 624, 633; 593 NW2d 520 (1999). Further, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. MCR 2.613(C); *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

We agree with respondent that the trial court erred in finding that clear and convincing evidence existed to terminate respondent's parental rights under MCL 712A.19b(3)(a)(*i*), (a)(*ii*), and (g).[2] Nevertheless, these errors are harmless because "only one ground for termination need

---

[2] MCL 712A.19b(3)(a)(*i*) may apply if, among other things, "[t]he child's parent is unidentifiable." This statutory ground was inapplicable because respondent was clearly identifiable as the mother of the children at issue. MCL 712A.19b(3)(a)(*ii*) may apply if the parent has "deserted the child for 91 or more days and has not sought custody of the child during that period." There was no testimony regarding how many days respondent was absent from her children or how much of her absence was due to involuntary hospitalization for treatment of her mental illnesses. Further, there is authority to support the proposition that an involuntary absence does not constitute "desertion" for purposes of MCL 712A.19b(3)(a)(*ii*). See *In re B & J*, 279 Mich App 12, 18 n 3; 756 NW2d 234 (2008) (involuntary deportation does not constitute "desertion" for purposes of the statute at issue). Thus, even if respondent had been absent from her children for 91 days or more, the evidence is not clear and convincing that her absence constitutes "desertion" for purposes of MCL 712A.19b(3)(a)(*ii*). Finally, the version of MCL 712A.19b(3)(g) applicable at the time pertained only if, in the court's discretion, respondent was

be established." *In re Schadler*, 315 Mich App 406, 410; 890 NW2d 676 (2016). The trial court properly found that respondent's parental rights were terminable under MCL 712A.19b(3)(c)(*i*) and (3)(j).

Turning first to MCL 712A19b(3)(j), this statute provides grounds for the termination of parental rights when clear and convincing evidence shows that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Evidence has supported termination under MCL 712A.19b(3)(j) where a respondent's lengthy period of mental instability was relevant to her present inability to care properly for her children, she made poor decisions during the time the children were not living with her, and her own testimony evinced a "lack of judgment, insight, and empathy for the child[.]" *In re Utrera*, 281 Mich App 1, 24-26; 761 NW2d 253 (2008). By contrast, the evidence did not support termination where a respondent had a diagnosed personality disorder, had made significant strides toward meeting the goals the court established, her psychologist testified that the respondent could make progress toward dealing with her personality disorder and then address her parenting problems within four to six months, and the trial court's conclusion that there was a reasonable likelihood that the child would be harmed if returned to the respondent's care was conjecture. *In re Boursaw*, 239 Mich App 161, 169-172; 607 NW2d 408 (1999) overruled in part on other grounds by *In re Trejo Minors*, 462 Mich 341, 353-354; 612 NW2d 407 (2000).

The case at bar is more like *In re Utrera* than *In re Boursaw*. The record shows that respondent's mental health issues resulted in the above-described cyclical pattern of behavior. Moreover, this pattern was not new. Waggoner testified to a prior CPS investigation resulting in substantiated allegations of failure to protect and improper supervision where respondent also failed to complete mental health and parenting services.[3] Whether because of her cognitive limitations, or her mental health issues, or a combination of both, respondent demonstrated an inability to manage her mental health issues by regularly receiving her medication and following up with appointments for mental health services. On at least one occasion when she forgot to take her medication, respondent lapsed into erratic behavior that scared the children.

The record also shows that respondent's limited parenting abilities posed a risk of physical harm to the children. The legal guardian ad litem testified as follows at the March 2018 dispositional review hearing:

---

financially able to provide proper care and custody for her children. The court used the previous version of the statute, which essentially allowed termination for failure to provide proper care and custody without consideration of whether the parent was financially able to do so.

[3] The original petition stated that the family had prior contacts with CPS in November 2008 and December 2009, which involved substantiated allegations of failure to protect, improper supervision, threatened with harm, and physical neglect. Respondent did not successfully complete services through Families First and Community Mental Health.

These children when all together initially when the case came in were extremely violent toward one another to the point where I walked in on a visit and [KC] had wrapped a belt around one of the other child's [sic] neck and he was standing on a bench and he was about to jump off and he would have been strangled and they punch each other and not just . . . little boy roughhousing things. I know that goes on. When they hit, they hit to hurt and so that's why the boys' visits are in two separate. We have the older two visiting mom at one time and then we have the younger two boys visiting at one time because mom can't—and doesn't even try to control these kids.

You have to tell mom, you know, that the 10 year old is punching the two year old and that's not a good idea. That was going on.

Whether because of respondent's inattentiveness to the children, her failure to recognize the dangerous potential of their conduct, or her inability to manage all of the children at once, Samaritas found it necessary to separate the two older boys from the two younger boys for purposes of parenting time. The record shows that respondent's parenting coach discontinued her services in June 2017, not only because of difficulty contacting respondent, but also because she felt respondent had reached her capacity to understand what the coach was trying to teach her. The coach opined that respondent would need significant support because she was still struggling with the children. Even after she reached maximum benefit of parenting coaching, and even though she only had two boys at a time, respondent still experienced difficulties during parenting time and "often need[ed] prompting to discipline or redirect the children."

Further, respondent lacked insight and empathy into the effect her behavior had on the children. For example, despite receiving repeated encouragement to attend parenting time and saying that she would try harder to be consistent, respondent continued to miss scheduled parenting times without calling and despite the emotional trauma created by her inconsistency. See *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011) (indicating that harm under MCL 712A.19b(3)(j) includes emotional harm). Waggoner testified at the termination hearing that the children became "very agitated, very aggressive" when respondent missed a parenting time. During the March 2018 review hearing, she recounted the following story as evidence of the harm caused by respondent's failure to participate in parenting time:

Most recently, on 3/6[/18] when [respondent] did not attend the visit, the children were not transported to the Samaritas office and the boys struggled immensely.

[DW] was very emotional and easily upset. [JC] became upset and was sent to his room for being aggressive toward another youth in the home. Upon entering the room, he began to bang his head on the wall. The foster parent had to separate [JC] from the wall with her own body until he was able to calm down. At which point, he sobbed uncontrollably. He has also talked about wanting to kill himself and occasionally punches himself in the face. The foster parent reported that this incident lasted 45 minutes to an hour.

In addition to causing the children distress by not attending parenting time, respondent talked to the children about the case, despite her caseworker's instructions not to do so. Respondent

created in the children false expectations that they would soon be back in her custody, even though nothing indicated that the trial court was prepared to end its exercise of jurisdiction over the children. In these and other ways, the record indicates that respondent was unaware of or unconcerned about the emotional harm she was causing the children by failing to take her medication, failing to show up for parenting time, and making the children believe, contrary to fact, that she and they would soon be back together.

The record amply shows the effects of respondent's failure to comply consistently with her mental health services, her cognitive limitations, her lack of insight and empathy into how her behavior affected her children, and her failure to demonstrate adequate parenting skills without supervision. Observations about the older boys' aggressive behavior toward the younger boys as well as respondent's need for direction during parenting time provide evidence of the potential for physical harm posed by respondent's deficient parenting skills. Addressing the trauma and emotional harm the children experienced while in respondent's care was a frequent topic of discussion during the dispositional review hearings. In light of this, the trial court did not err in finding clear and convincing evidence of grounds for termination under MCL 712A.19b(3)(j).

Respondent argues on appeal that the trial court's termination of her parental rights penalizes her for being poor and unable to obtain the long-term inpatient treatment necessary to stabilize her mental health. She further argues that Waggoner's opinion regarding the likelihood that her mental health would decline and pose a risk of harm to the children was mere speculation and an insufficient basis upon which to find clear and convincing evidence to terminate under MCL 712A.19b(3)(j).

Respondent's implication is that her period of long-term inpatient care produced results that the short-term stays and outpatient types of care available to her did not. Given that respondent did not consistently avail herself of the mental health services that were available to her, her argument is speculative. Furthermore, stabilization itself was not the issue; consistent compliance with her mental health services to maintain her stability was. As Waggoner testified, respondent had been stable before, but each time she neglected to follow up with mental health services until, eventually, she required hospitalization. Moreover, the record shows that even when respondent was stable, her cognitive limitations, including memory issues, prevented her from acquiring, retaining, or independently employing information and skills necessary to keep her and her children physically and emotionally safe over time. The trial court handled this case for nearly three years, during which time the court had an opportunity to observe respondent's inability to comply with her mental health services and the effects this had on her and her children. The court also received regular reports from service providers and caseworkers closely involved with respondent's struggle to take care of herself and to do the things necessary to regain custody of her children. Given the record before us, we conclude that the trial court did not clearly err in finding clear and convincing evidence to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(j). Because only one ground is required for the termination of parental rights, *In re Schadler*, 315 Mich App at 410, we need not address MCL 712A.19b(3)(c)(*i*), although the record supports the trial court's finding on this statutory ground as well.

## B.  BEST INTERESTS

Respondent also contends that the trial court erred in finding that termination was in the children's best interests.  She asserts that the difficulties the children had when she missed parenting time demonstrates that a parent-child bond exists.  She argues that, given this bond, and considering the mental stability achieved by her recent extended in-patient treatment, it was in the best interests of the children to give her more time to show that she could maintain her mental stability and parent her children.  We disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made."  MCL 712A.19b(5).  "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home."  *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted).  When making its best-interests determination, the court must consider whether the record as a whole proves by a preponderance of the evidence that termination is in the best interests of the child.  *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013).

Although record evidence suggests that the four boys were bonded with respondent, there was no testimony regarding the parent-child bond between respondent and her youngest child. As explained above, respondent's parenting abilities put the children at risk of harm caused by each other and by respondent's inability to attend and comply with mental health services. Respondent's parenting coach surmised that it would take a lot of support to put respondent in the position of being able to parent her children, and her psychological evaluator opined that respondent was simply unable to care for her children.  Even Waggoner testified that, in light of respondent's mental stability at the time of the termination hearing, it would be 18 months to two years before respondent would be able to take care of her children alone.  The children had been under the court's supervision for 35 continuous months, and at the time of the termination hearing they ranged in age from 10 years old to nearly three years old.  Nothing in respondent's historical pattern of behavior indicated the likelihood that she would be able to maintain mental stability and obtain and employ the skills necessary to care for the children within a reasonable time, given their ages.  The children were generally thriving in their foster homes and their schools, and they were receiving therapy services to address their behavioral and mental health issues.  Petitioner investigated respondent's last-minute suggestions for relative placement but found those suggested either unwilling to take placement or their homes unsuitable for placement.

Respondent argues that, given her mental stability at the time of the termination hearing, the trial court should have allowed her another review period to reengage with services and demonstrate that she could overcome the barriers to reunification.  However, even if respondent were able to maintain compliance with her medications and other mental health services, Waggoner testified that it would be a minimum of 18 months before respondent could hope to parent her children without supervision.  At the best-interests stage of the proceedings, the focus is on the children.  *In re Moss*, 301 Mich App at 88-89.  The record shows that the children were receiving the mental health services they needed, and that they generally were thriving in their

placements. Allowing respondent an additional reporting period would introduce impermanence, instability, and open-endedness where the children needed permanency, stability, and finality. The record as a whole proved by a preponderance of the evidence that termination was in the best interests of the children. Accordingly, the trial court did not err in terminating respondent's parental rights to the children.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Anica Letica